IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

UNITED STATES OF AMERICA      )
                              )   CASE NO. 6:22cr146
                              )
      -vs-                    )
                              )   Tyler, Texas
                              )   1:29 p.m.
KELLY JASON SMITH             )   May 31, 2023

TRANSCRIPT OF PRETRIAL HEARING
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

2

A P P E A R A N C E S


FOR THE GOVERNMENT:

MS. TRACEY M. BATSON
ASSISTANT U.S. ATTORNEY
U.S. DEPARTMENT OF JUSTICE
101 E. Park Blvd., Ste. 500
Plano, Texas 75074-6759


MR. LUCAS R. MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas  75702


                              * * * * * * * * * * * * * *


FOR THE DEFENDANT:

MR. CODY L. SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201


MR. TOBY L. SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., LB 92
Dallas, Texas 75201


COURT REPORTER:          MS. SHEA SLOAN
                         FEDERAL OFFICIAL COURT REPORTER
                         211 W. Ferguson
                         Tyler, Texas 75702
                         shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was produced by computer-aided transcription.

P R O C E E D I N G S

(Call To Order Of The Court.)

THE COURT:  Thank you.  Please be seated.

Okay.  So this is Criminal Action 6:22cr146, United States vs. Kelly Jason Smith.

I will take appearances.

MS. BATSON:  Good afternoon, Your Honor.  Tracey Batson for the Government, along with Lucas Machicek.

MR. SKIPPER:  Good afternoon, Your Honor, Cody Skipper and Toby Shook for Mr. Smith.

THE COURT:  Okay.  Thank you.

So do we want to start with the motion to continue?

MR. SKIPPER:  That's fine, Your Honor.

THE COURT:  Okay.

MR. SKIPPER:  Your Honor, I filed a motion last evening, it is Docket No. 59, just requesting some additional time.  There is a lot going on substantively within that request.  Toby and I have several discovery items that have not been provided.  They are in the process of being provided.

THE COURT:  What are you talking about?  What hasn't been provided?

MR. SKIPPER:  This is not with regard to the Government at this point, third-party --

THE COURT:  Okay.

MR. SKIPPER:  -- with regard to some public information requests.  I have not sought intervention by the Court yet through a 17(c) reference.  I think we can handle that on our own.  They are being complied with.

One individual indicated to me as early as yesterday that he dropped the items in the mail.  And another one is ongoing.  I received some of those items partially via email, and they expect to get those to me -- didn't give me a deadline, but it is ongoing, with regard to those third-party items.

THE COURT:  Okay.

MR. SKIPPER:  There are also some discovery items that the Government is going to provide to us today.  They have indicated to us that we could bring a 32GB drive, which I have brought here a 64GB drive, to obtain some discovery items.

I'm not sure in particular what those items are. There is no index.  But as far as the May 30th date, this has been set since whenever Your Honor set the order --

THE COURT:  January.

MR. SKIPPER:  January, yes, sir.  And without those items, not knowing what those items are and having deadlines, one of which I missed based on this motion, being the trial brief, I don't know what to mark, what not to mark, what is of substance or not.

The third issue is, and maybe the most -- one of the most important, the 404(b) disclosure that was filed within the last two days. This relates to an incident allegedly that occurred in June of 2000, 13 years ago.

THE COURT: 2010, you mean.

MR. SKIPPER: 2010, I'm sorry. June of 2010, according to this notice.

Mr. Shook and I received notes related to this incident, on May the 9th. Those notes indicated an interview that was conducted by Agent Crowell of the FBI of Jacob Richardson on November the 22nd. And those notes of the interview with Jacob Richardson on November 22nd indicated that he was shown a video, a dash cam video, and that he could remember a lot of things from that dash cam video.

What those notes also said was that he was shown -- may I have one moment?

THE COURT: You may.

(Pause in proceedings.)

MR. SKIPPER: What those notes indicate, which again were not provided until May the 9th of this year, was that this man, Jacob Richardson, was shown a video of Kelly Smith's July 25th, 2022, incident.

This man Jacob Richardson is a peace officer. He worked with Kelly while they were at Van. And these notes state, and I quote: Did not want to provide an opinion

6

without more information.

That is what that statement said from November the 22nd of 2022.

That's somewhat important for someone defending a man who is accused of a violation of violating someone's civil rights when the individual has been shown a video of something, and they didn't want to give an opinion or did not give an opinion.

But be that as it may, those notes were disclosed on May 9th, and it indicates that this young man was allegedly driving a motorcycle at a high rate of speed in June of 2010. And Mr. Smith and Jacob Richardson -- this was shortly after Mr. Smith came back from the FBI Academy -- entered into a pursuit of this young man, which would be a felony traffic stop.

And if one is to -- the reader, I should say, being this Court, read that notice, one would think that it is a completely innocent situation where some young man was just pulled over for abiding by the law.

THE COURT: Why do you need more time on that? I'm not following you.

MR. SKIPPER: Because I need more time to interview him. I need more time to interview --

THE COURT: Well, the trial isn't for three weeks.

MR. SKIPPER:  I'm sorry?

THE COURT:  The trial isn't for another three weeks.

MR. SKIPPER:  I understand, Your Honor.

THE COURT:  Why can't you do it in a three-week time period?

MR. SKIPPER:  Well, I need to interview him, I need to interview the young man, I need to interview some of the other officers.  This is -- you know, what this 404 notice is -- I am just talking about in terms of getting into a mini trial, assuming the Court determines that is admissible, that is all I am saying.  So that is another issue that is cause of some concern.

And there are some other witnesses that we do need to interview that may or may not be called by the Government.  I am not sure about the witness list yet.  And perhaps one or two other expert witnesses.  Mr. Smith is on pretrial release.  He has been compliant with his conditions of pretrial release.  I understand the Court has had this set, but --

THE COURT:  Yeah, I am reluctant to continue it.  Because we had a status conference, I think in December, maybe it was January, where we talked about, you know, when the best time to set this trial was.  We all held hands and agreed it would be in June.  We have all arranged our

schedules accordingly.  You have had plenty of time to get the evidence you are seeking.  And here we are on the eve of trial, and you are asking for more time.

MR. SKIPPER:  Well, Your Honor, I am literally going to pick up more discovery from the Government today, and I don't know what that discovery is.

THE COURT:  Okay.  Let me hear from the Government.

MS. BATSON:  Yes, Your Honor.

Yes, Your Honor, December 19th was the status conference when we set the trial in June.  And that was some six months ago.

As far as the discovery that Mr. Skipper is alluding to, he has requested all of the emails, text messages from the agents, as well as their investigative notes.

While I explained to him that this is early production of Jencks, that I would be happy to give that to him.  And so that is what is going to be on there.

Also, there is -- we told him 32 gigs just to make sure we had enough, but it is actually 10.8 gigs, and 6 of that is a video of the family violence involving Robert Evans, which is part of the Wood County DA file that Mr. Skipper -- we believe that he has a copy of.  So just really it is 4.8.

The text messages, again, the emails and -- between the agents. And that is what you have requested. And we said that we would give that to you.

As well as there is some information about Mr. Smith's assets, that is Lindale Veterinary and Paladin Solutions --

THE COURT: That is what you are giving him today?

MS. BATSON: Yes.

THE COURT: Do you want to address this 2010 incident?

MS. BATSON: Your Honor, Mr. Machicek will address it.

MR. MACHICEK: Your Honor, with regards to the 2010 incident, there is going to be some additional disclosure with regards to the FBI investigation of that incident, as well as the agency reports who investigated that incident.

The rules require a notice under 404(b). They don't require the grant of discovery for unrelated matters. However, 30 days before trial or 28 days before trial we are willing to make that disclosure to the Defense, and they can have ample time to prepare and rebut any of the allegations contained in the 404(b).

We would be offering that evidence under 404(b) for the purpose of showing the Defendant's knowledge, opportunity, lack of accident or mistake, motive of intent to

the present offense.  It's the most analogous previous circumstance that Mr. Smith has found himself in as a law enforcement officer in a use of force situation.

There is a conversation --

THE COURT:  It is pretty old, I mean, 13 years ago.

MR. MACHICEK:  I think the length of time separating the two was also important to illustrate the length of time the Defendant had knowledge of this type of incident of his evaluation that perhaps the incident constituted a bad act there might be consequences for.  So for 12 to 13 years he has known that, leading up to this incident.

THE COURT:  Okay.

MR. MACHICEK:  And it also falls within the time frame that case law affords for with this type of 404(b) information.  It is not limited like information under 609 to a 10-year time frame.

THE COURT:  Okay.

MR. SKIPPER:  May I respond?

THE COURT:  Yes.

MR. SKIPPER:  I don't have any evidence of the Robert Evans video of June 21st of 2022.  I'm not sure where that comes from.  I have never received that evidence.  So if you have something showing otherwise.

I received the arrest warrants from that incident, pursuant to a public information request, on June 21st of 2022. This is the pending allegations of which it is alleged that Robert Evans slammed his son's head in the wall and assaulted his wife. That is what the warrants were there for when Kelly and others were there on the scene on June 25th, 2022, and arrested. I don't have any video of that. I have requested video of that.

THE COURT: Is there video of that?

MS. BATSON: Yes. And we will provide it.

And you are saying that you have not received it from Wood County?

MR. SKIPPER: Just as an officer of the Court --

MS. BATSON: I understand.

MR. SKIPPER: -- I've never received that. I asked them to provide me that. They referred me to the AG's office and said they are not going to provide it.

THE COURT: It is being provided today, correct?

MS. BATSON: Yes, Your Honor.

THE COURT: Okay.

MR. SKIPPER: I don't have any of the evidence from the 404(b). I am not sure -- I guess, is that going to be today on the 404(b) incident?

MR. MACHICEK: It would be included in the disclosures today.

MR. SKIPPER:  As far as, Your Honor, since the Government brought this up, it wasn't my intent --

MS. BATSON:  I'm sorry.  And just to be clear, Your Honor, when the Court moved up the pretrial date, I did email Mr. Skipper and tell him that we were going to file this notice of the 404(b) by Tuesday, and he said, understood.  And so he was clearly aware of its coming.

THE COURT:  Okay.

MR. SKIPPER:  Your Honor, the Government keeps bringing things up.  I'd like an opportunity to respond to that on the record.

THE COURT:  Okay.

MR. SKIPPER:  Thank you.

(Pause in proceedings.)

MR. SKIPPER:  Just by way of background, we have been given multiple items that would be considered 404(b) evidence in this case, an investigation from 2011 where the FBI thought that Kelly had misappropriated funds that went nowhere.

The FBI interviewed him.  Ironically, Greg Waldron, the man who now represents Robert Evans, who was Kelly's lawyer at that time, and the FBI said there is nothing there.

Other items have been disclosed now that people think -- that have never been reported before that Kelly is a bad guy, bad officer.  Those things have been rolling in,

Your Honor, over the course of this discovery production.

So when -- we had our meet-and-confer on Friday, May 19th of 2023, and on May the 23rd, that's a Wednesday -- pardon me, that would be a Tuesday, at 5:41 p.m., Tracey Batson emails myself:  Since our pretrial date is now next week, we will try to get any notice of 404(b) to you by Tuesday, May 30th, 2023, comma, if applicable.

There is no specifics of what incidents she is talking about.  Of course I said okay.  Nothing.  And comma if applicable, meaning, to me, if she decided to file a notice.  Because, again, I have no evidence with which to investigate, although they have had that since November 22nd of 2022.

I understand what the rules are as far as the disclosure, but the notes of the interview with Jacob Richardson sat in a 1A file of the FBI from November 22nd until May the 9th.

THE COURT:  Richardson was what?

MR. SKIPPER:  He was the police officer and colleague that sat in the passenger seat while --

THE COURT:  He was there?

MR. SKIPPER:  Yes, sir.

THE COURT:  Okay.

MR. SKIPPER:  So, again, for the Government saying, well, I let Mr. Skipper know, no, you said if applicable you

would file a 404(b) notice.

I am not using this, Your Honor.  I am just saying he has a right to an effective defense.  And if this young man, his mother, Jacob Richardson, who I haven't spoken with, is going to come in under oath and say these things in light of what he told the FBI, I would like ample opportunity to interview everyone around him effectively and efficiently, and that means by showing him the same video that the FBI showed him, which apparently doesn't even have any audio.

So the notice is filed with this Court, and I want to get to this because Ms. Batson brought it up.  This isn't really a Brady/Giglio hearing.  But when Ms. Batson says this is all Jencks material that she is providing me as a courtesy, we have a disagreement fundamentally of a prosecutor's obligation under due process, under Brady and its progeny, Giglio, Jencks -- pardon me, Giglio, Agurs, Kyles vs. Whitley.  When there is impeachment information inside of a document because Giglio is rolled up into Brady, they have an obligation, the Government, without me even asking, to turn that information over.

And so for Ms. Batson again to say this is Jencks material, Your Honor, it is Jencks that is Giglio.

I am not on a fishing expedition.  I have been a federal prosecutor.  I am not throwing a wide net and telling you that I don't have anything to support that, but there has

not been one time in this case since I have been on it that Ms. Batson has even recognized that this is being provided to you because I am obligated.

She continues to say, and to this very Court, this is Jencks material that we are providing. She tells me as a courtesy. That is simply not the case.

THE COURT: So if I were to grant your motion, how much more time do you think you would need?

MR. SKIPPER: May I have one moment, Your Honor?

THE COURT: Okay.

MS. BATSON: And, Your Honor, before granting the motion, if I could just admit all of the Government's letters for discovery and point the Court to U.S. v. Causey, 356 F.Supp.2d 681 that outlines Brady, Giglio, and Jencks.

And even the Court's own pretrial order said that 302s are excluded. We have given him the 302s, which is outlined in all of the discovery letters. I would like to admit those at this time.

THE COURT: Any objection to those being admitted?

MR. SKIPPER: I didn't hear any of that, Judge. But I have no objection.

THE COURT: Okay. They are admitted.

MS. BATSON: Thank you, Your Honor.

(Pause in proceedings.)

MR. SKIPPER: Your Honor, we would propose

16

September the 11th or the 19th --

THE COURT:  Well, I don't need a date.  What I want to know is, in your dream world, if you got to do everything you want to do, how much time do you need?  You already have a month.  I mean, how much more time do you think you reasonably would need?

MR. SKIPPER:  Through the summer.

THE COURT:  All right.  Let's set that aside.  I am going to rule on this motion on the papers.  So let's go through -- I have got two motions in limine pending.  Let's start with the Government's.

MR. MACHICEK:  Your Honor, with regards to the Government's motion in limine, Items 1 through 7, based on the certificate of conference, are agreed.

The first contested items, I have No. 8, which concerns any pretrial rulings by the Court, including, but not limited to, any statement, motion, or request regarding discovery, any bond rulings by the United States Magistrate Judge, any reference to pretrial hearings, including rulings by the Court, or any testimony and transcripts thereof.

Essentially, our argument is that these items are inappropriate for jury's consideration because they concern issues of law that are outside the purview of the factfinder. The jury would be seated in the box to determine the facts of the case and to apply the laws given to it by the Court.

These pretrial rulings concern matters of law that the jury is simply not situated to answer.

THE COURT:  Okay.  Mr. Skipper?

MR. SKIPPER:  Let me just find this number.

THE COURT:  No. 8.

MR. SKIPPER:  My objection there is based on being overbroad.  Testimony and transcripts says testimony -- testimony would be from a witness.  I would object to I guess 8 subsection (d), sworn testimony of someone at any point.  I would like to be able to use that.

MR. MACHICEK:  Your Honor, as it presently stands, there haven't been any witnesses testify in any pretrial hearings under oath.  I don't believe that would be applicable.  We can deny part (d) as moot.

THE COURT:  I will grant it and deny (d) as moot.

MR. MACHICEK:  Item No. 9, Mr. Skipper's conference indicated some confusion.  I think it is largely duplicative of any sympathy regarding negative consequences for the Defendant's family.  I think that is where we were going with that one.  It is sort of brought into the previous agreed Item No. 2 that asks for nullification based on sympathy.

THE COURT:  Okay.  Mr. Skipper.

MR. SKIPPER:  With that clarification, I will agree to that.

THE COURT:  Okay.

18

MR. MACHICEK:  No. 10 refers to reputation or character testimony concerning any of the Government's witnesses without first allowing the Assistant U.S. Attorney outside the presence of the jury to question such reputation witness to ascertain if he or she possesses the legal qualifications to testify.

Essentially, the rules permit general reputation testimony regarding truthfulness or untruthfulness where a foundation has been laid.  This is precautionary measures to make sure a foundation is laid prior to asking questions.

THE COURT:  Okay.

MR. SKIPPER:  I would propose that as a ruling for the Court, not me --

THE COURT:  I will grant that.

No. 11.

MR. MACHICEK:  No. 11 has to do with reputation or character testimony or evidence concerning the victim in the Government's Indictment without allowing the United States Attorney outside the presence of the jury to question any witness, including any expert witness, about such testimony or evidence to ascertain if they possess the legal qualifications.

This, again, is a prophylactic measure to make sure the foundation has been appropriately laid, that the question pertains to a permissible character trait under the rules.  I

have cited several items here.  Specifically, under subsection (a), the fact that the victim in the case -- or any insinuation that the victim in the case is, quote, a methamphetamine user.

There is no evidence that the Defendant in this case possessed any knowledge at any time prior to this interaction with the victim in this case with any methamphetamine use, nor is there any evidence that methamphetamine use, paraphernalia was recovered at the time of his arrest.

There is no impact, therefore, on the Defendant's mens rea at the time of the charged act.  Because there is no probative value in that regard, its prejudicial impact substantially outweighs its probative value.

MR. SKIPPER:  We are on No. 20(a)?

MR. MACHICEK:  This would be I believe No. 11(a) of the most recently filed version.

MR. SKIPPER:  There is about four of these that we are trying to work through.  I don't have 11(a).  I have 20(a).

MR. MACHICEK:  It may be 20(a).

MR. SKIPPER:  Methamphetamine users, improper name calling?

MR. MACHICEK:  Yes, sir.

MR. SKIPPER:  Okay.  Your Honor, as far as the

methamphetamine use, if a witness has lied to the FBI the last time of their usage of methamphetamine, that would go to impeachment value under Rule 611(b).  It certainly has the relevance in terms of the credibility of a witness.

If he has specifically been asked during an interview on November 30th of 2022 in his lawyer's office, when was the last time you smoked methamphetamine, and he said January of 2022, and the very medical records that were obtained and provided by the Government through a business record affidavit indicate that he had methamphetamine in his system in July -- July 25th of 2022 at the time of this incident.

And so for the Government to say it is not relevant when they asked the question --

THE COURT:  Well, was he on methamphetamine at the time of the incident?

MR. MACHICEK:  Following the incident, there was a medical record that contained a drug test that indicated he was positive for methamphetamine.  However, there is no indication that he was actively under the influence of methamphetamine.  There was no paraphernalia or methamphetamine located.

MR. SKIPPER:  There was paraphernalia located, with the video that I am offering, the lighting torch, Your Honor.

THE COURT:  In the house?

MR. SKIPPER:  Yes.

THE COURT:  At the time of the incident?

MR. SKIPPER:  It was the day after, Your Honor, after he was arrested and taken to jail.  Presumably -- it was in his room.  No one broke in -- assuming someone didn't put a torch in there.  But that is one part of my response to -- if I may address the other one, Your Honor?

THE COURT:  Uh-huh.

MR. SKIPPER:  With regard to it not having any value as far as the mens rea, as this Court knows, a charge under 18 USC, Section 242 carries the highest mens rea in the criminal system, the highest.  It is not negligent.  It is not reckless.  It is not knowingly.  It is not intentionally.  It is willfully.

It is a specific intent crime of which the Government has to prove beyond a reasonable doubt, not only, (1), that Kelly Smith violated another's constitutional rights, specifically in this case one's Fourth Amendment right against illegal seizure, and that is just the Graham vs. Connor standard, which, as you know, is the same standard under a 1983 case.  The same civil standard applies in determining one prong of reasonableness, Graham vs. Connor.

If and only then a factfinder determines that facts warrant unreasonableness -- for instance, here there was

expert disagreement with regard to whether this arrest with the K9 was reasonable.  Only then do you go to determine whether or not it was willful.

And willful is the specific intent to do something the law forbids.  You know it at the time you do it.  You have at least a bad purpose.  Used to the Fifth Circuit patterns included --

THE COURT:  I don't think the Government is saying his methamphetamine use is completely irrelevant to the case. I think he is saying just if you are going to have a witness testify about that, he wants the opportunity to examine the witness without the jury present first.

Right?

MR. MACHICEK:  That's correct.  And I think the insinuation that somebody is a methamphetamine user without the Defendant in this case, who committed the act alleged in the Indictment, having any knowledge of the person's methamphetamine use, I think that that obscures the mens rea issue before the jury as to what this Defendant knew at the time he chose to make the actions that he undertook.

And so there have been a number of different filings, a number of different expert reports that have been admitted that the Defendant had no knowledge prior to the incident alleged in the Indictment of any methamphetamine use associated with this Defendant.

23

MR. SKIPPER:  Which can go to his mens rea, Your Honor.  If I may address this.

The witness who would say that is your own witness.

Robert Evans is going to testify first.  We have no burden.  So presumably that is going to come out --

THE COURT:  Let me ask, so what is it that you are wanting to limine out?  Any testimony about the victim being -- using methamphetamine or --

MR. MACHICEK:  What I am specifically trying to limine out is any insinuation that the Defendant chose to do what he did, as alleged in the Indictment, on the basis of any knowledge of methamphetamine use that he admittedly did not have.

MR. SKIPPER:  Which is the very basis, Your Honor -- this is -- no logic.  It is circular.  Why in a specific intent crime we are allowed to put on --

THE COURT:  Is there any evidence that he did have that knowledge?

MR. SKIPPER:  No.  That is the whole point that he is not going -- Your Honor, if I may.  I will brief the Court on this.

In a specific intent crime on a 242, you can put on evidence that he was just doing his job; that he was just doing X, Y, and Z; that he did not have knowledge of these things.

24

If he did, that is the whole reason for -- well, this guy has got an evil motive.  He has got a bad purpose.  So that is the whole point of the Government says it is not relevant to the mens rea.  It absolutely is relevant to the mens rea.  It is relevant to the credibility of every witness the Government puts on who knows about it or didn't disclose that at the scene as Hawkins peace officers.

THE COURT:  But if there is no evidence that the Defendant knew of the methamphetamine use, how is it relevant?

MR. SKIPPER:  Well, it shows he was not acting willfully.  It is evidence to support that he did not have -- I am going to go in here -- I can't stand methamphetamine in our communities.  I am going to go in there and have my dog bite him in the foot and put three stitches in his foot.  I'm going to go in there and say --

THE COURT:  I am confused.  So you are agreeing there should not be evidence that the victim was using meth?

MR. SKIPPER:  No, no, I am not agreeing.  It is for two issues, Your Honor.  The Government is trying to -- it is admissible for two purposes.  To impeach --

THE COURT:  This being the evidence of the --

MR. SKIPPER:  -- methamphetamine use.

THE COURT:  Okay.

MR. SKIPPER:  It impeaches the Government's case.

And it confirms the Defense theory that Kelly was not acting willfully.

THE COURT:  I don't follow you.  How does it do that?

MR. SKIPPER:  Because he did not specifically know at the time that he is a methamphetamine user.  He is not using that as an evil purpose, an evil motive or a bad purpose to go in and do something the Government says that he did willfully.  That is what I am saying, Your Honor.

Whether the factfinder believes it or not, I am saying there is sufficient linkage.  I can brief this later for the Court.  But where -- in a specific intent crime like this, willful conduct, courts have admitted testimony, evidence of an officer just doing his job, things that would negate willfulness, things that would support non-willful conduct.  It is intentional, but he is not doing it with an evil motive or a bad purpose.

So that is why it is relevant to the mens rea. It's also relevant to impeach any witness, including Robert Evans.

THE COURT:  So do you have anything specific in mind to worry about?

MR. MACHICEK:  Really, this is an improper character evidence objection and a nullification objection. If Robert Evans testifies, he can certainly be questioned

about his drug use.

I don't have any problem with Robert Evans being questioned about his drug use or any other witness being questioned about their drug use, given the Court's Fifth Circuit Pattern Jury Instruction regarding a witness's use of addictive drugs.

The problem with it is, is to paint the victim as a methamphetamine user in order to nullify the charge in front of the jury or to prejudice his character with some fact that the Defendant was unaware of at the time that he chose --

THE COURT:  So then what specific evidence are you thinking about that you don't want the jury to hear?

MR. MACHICEK:  Evidence from people who are not Robert Evans about his methamphetamine use that have no personal knowledge of Robert Evans' methamphetamine use, to establish through third-party witnesses some insinuation that Evans is a methamphetamine user to somehow justify the civil rights violation that was perpetrated upon him.

THE COURT:  Okay.

MR. SKIPPER:  I would be doing it for the very opposite.

THE COURT:  I am going to grant that, and we can revisit this issue as the evidence comes up.

MR. SKIPPER:  Your Honor, just a point of clarification, if I call Jennifer Evans as a witness, his

estranged wife, who specifically said he is a methamphetamine user, does that mean I cannot ask her whether --

THE COURT:  Well, it sounds like she would have personal knowledge.

MR. SKIPPER:  That's what I --

MR. MACHICEK:  She would have personal knowledge, but, again, the evidence offered to illustrate a victim's character under 404(a)(1)(B) is of a pertinent character trait, and so there would have to be a foundation established that methamphetamine use is somehow a pertinent character trait to the apprehension of the individual.

MR. SKIPPER:  Well, if he is lying about it -- isn't -- is a character trait.  That is what it will be called --

THE COURT:  I am going to grant that particular motion, and we can revisit the issue once the evidence starts coming in.

Now, I think you skipped several.  Are you giving up on 11 through 20, Mr. Machicek?

MR. MACHICEK:  Your Honor, I think I got my list mixed up.  We can go back.  What do you have as No. 11?

THE COURT:  I have as 11, specific prior good acts of Defendants.

MR. MACHICEK:  Okay.  Specific prior good acts of Defendants would fall under 404(b).  Where the Government is

prohibited from offering evidence of specific instances of conduct to show propensity, the Defendant is likewise restricted from offering specific instances of conduct to show good behavior.

Witnesses are permitted in general to lay a foundation of their knowledge and background and relationship with the Defendant to propound a general character trait for either truthfulness, untruthfulness, law-abiding conduct, or non-law-abiding conduct. But specific instances of conduct is not permissible under the rules, and we would object to any of that.

THE COURT: Mr. Skipper?

MR. SKIPPER: The instruction the jury will have is that Kelly Smith acted with a bad purpose. We would obviously want to put forth that he acted with a good purpose. So the bad purpose is the instruction. And we will also defer to the Court. Any pretrial examination is not a decision for me to make. It is the Court's.

But the reason I opposed that is because in this unique charge, they must prove a bad purpose. And, obviously, I don't think it was a bad purpose. So things that would come out, good character witnesses, would be contrary to the allegations in the Indictment, including the obstruction, the lying in the affidavit.

THE COURT: Okay. I am going to grant No. 11.

MR. MACHICEK:  No. 12 relates similarly to that, Your Honor.  It would be the restrictions on the witnesses propounding a general reputation or character testimony with regards to the Defendant without first laying a foundation.

This, again, is a similar prophylactic measure to the previous similar items that relate to the evidentiary standard for that foundation to provide that type of testimony.

MR. SKIPPER:  And, again, it is the Court's decision.

THE COURT:  I will grant that one.

No. 13 I have as current or past health condition of the Defendant.

MR. MACHICEK:  Yes, Your Honor.  This again rolls into the nullification aspect of No. 2 that the parties have previously agreed to.

Any evidence regarding any kind of health condition of the Defendant or his family in order to garner sympathy, in an effort to adduce nullification from the jury outside the Court's instructions, we would ask that be limined out.

As I understand it, there may be an intent to offer evidence of any injury sustained during the course of the incident.  We would not object to that.  Only to talk about any kind of subsequent injury sustained to garner some sort of sympathy or insinuate prison would be difficult if the

consequences would --

MR. SKIPPER:  I have already agreed to the prison issue.  With no clarification, I am still befuddled.  I have no idea what health issues my client is undergoing.  I don't know what I would be prevented from --

MR. MACHICEK:  If there is nothing that you are aware of --

THE COURT:  I will grant that, and we can revisit it if the issue arises.

No. 14.

MR. MACHICEK:  This deals with a prior incident involving Special Agent James Crowell and a deadly officer-involved shooting while employed with the Bay Area Rapid Transit -- as a Bay Area Rapid Transit officer in San Francisco on July 3rd of 2011.

This matter was investigated.  Agent Crowell was not criminally charged, and there was no civil finding of any wrongdoing.

Further, more than 10 years have passed since the incident occurred.  Therefore, any mention of the incident would constitute improper impeachment under Federal Rule of Evidence 609, and it lacks any other probative basis.  It is a textbook prior specific instance of conduct prevented under 404(b), 608(b), and 609(b).

MR. SKIPPER:  Your Honor, I will defer to the Court

on that and certainly approach if the door is opened.  That is in there on my position based on James Crowell as one of the lead agents here.

THE COURT:  Okay.  I am going to grant No. 14.

15.

MR. MACHICEK:  This is a similar incident involving another case agent in this matter, Stephanie Davis, Special Agent with the FBI, regarding discovery issues in a case of United States v. Nicholas Lattanzio, Case No. 2:15cr446KM.

Special Agent Davis was a co-case agent.  There was an opinion issued regarding improper discovery in that case.  The blame in that case was assigned to an officer who accepted the blame that was not Agent Davis.

She was never punished.  Never sanctioned.  Never assigned any sort of liability with regards to that conduct, and, therefore, it similarly falls outside the proper impeachment evidence.

MR. SKIPPER:  She was reassigned to the Washington Field Office.  I just wanted to clarify that.

THE COURT:  Okay.  I am going to grant it.  Is it No. 15?

MR. SKIPPER:  Yes.

MR. MACHICEK:  And, Your Honor, just as a point of clarification, Mr. Skipper has insinuated that the agent was reassigned as a result of that.  It was our understanding she

was promoted to a different position in that office.

THE COURT:  Okay.

MR. SKIPPER:  Your Honor, just because -- there is a transcript -- there is a transcript of this hearing, Case No. 2:15cr00446KM before the Honorable Kevin McNulty, District of New Jersey.

Three witnesses testified, Brian Herring, Gregory Yankow, Michelle Pickles.

On Michelle Pickles' direct:

QUESTION:  Was she still working for the FBI?

ANSWER:  Yes.

Was she reassigned?  She, being Stephanie Davis.

Yes, she was.

To where was she reassigned?

The Washington Field Office.

That's all we have.

THE COURT:  16, any reference to information included in draft transcripts.

MR. MACHICEK:  As draft transcripts are not the best evidence of a transcription by a certified --

THE COURT:  What do you have in mind?  There has been draft transcripts --

MR. MACHICEK:  There have been draft transcripts put together for videos by agents.  There is a contentious one in particular where a special agent wrote a draft

transcript in their 302 that was later determined there was a falsehood in that transcript.

That transcript, the draft itself, was never used in any court proceeding, any filing with the Court, or before the Grand Jury. However, the draft transcript exists.

We have since gotten certified transcriptions of those videos. Those transcriptions will be married up with the videos themselves. The Court will be giving jury instructions to the jury about how they should consider transcripts versus their own hearing of the videos. I think it confuses that issue.

THE COURT: Okay. Mr. Skipper?

MR. SKIPPER: Your Honor, the Government has asked the Court to prevent an attorney for a charged Defendant from impeaching an FBI agent for filing a false statement.

THE COURT: What is the false statement? What specifically?

MR. SKIPPER: The false statement is -- I will read it to you.

On August 22nd, Stephanie Davis and her secretary Sally Smith, they reviewed what the Government has described as the Kelly shortened video. And Stephanie Davis, with the assistance of OST secretary Sally Smith, she transcribes this video -- all three videos. There is a video of Austin Milbourn, there is a video of Kelly Smith, and there is a

video of John McQueen.  This is audible on the video.

When Kelly Smith is standing outside of Robert Evans' bathroom just after Robert Evans slams the door on his finger and breaks it, Kelly Smith is saying:  Show me your hands.

It is clearly audible.  There is no distinction discrepancy of what -- show me your hands.  You are barricaded, brother.  I don't know if you have any weapons. Show me your hands.

Stephanie Davis, I am not sure, I haven't inquired yet if she has any -- has had any auditory concerns in the past, but she writes down:  Your ass is going to be grass.

Now, if someone is charged with a 242 violation, evidence of which has to support an evil motive or a bad purpose, Stephanie Davis does not write "draft" anywhere on this document from August 22nd.

What does she do?  She attaches it to an official 1A along with this video, an official FBI document saying, despite 100 percent evidence to the contrary, that, no, even though she had the opportunity and did use the two letters UI in this transcript, which means unintelligible, to give her the benefit of the doubt, she said something, even though it is 2023 not 1970:  Your ass is going to be grass.

She adopts it.  Puts it into a formal 1A with a case file number on it.  Here.  And nowhere in this

transcript does it say this is a draft transcript.  This wasn't a Michael Flynn draft transcript.  This is a formal transcript.

In the 1A signed by Stephanie Davis submitted to her supervising special agent, she says:  Transcription and thumb drive containing shortened version of body camera footage.

Saying, when Kelly Smith clearly says, "show me your hands," "your ass is going to be grass."  What does she further do?  She puts it in a 302.  A formal document.  Again, nowhere on this document does it say draft anything.

It says -- and may I read it?  On August 22nd, 2022, writer -- that being Stephanie Davis -- and OST Sally Smith transcribed, quote, to transcribe, there is no "draft" before that word, the shortened version of Austin Milbourn's body footage captured during July 25th, 2022, arrest of Robert Evans.

Transcription, not the draft transcription, transcription and a thumb drive containing the body camera footage are retained in a 1A attached to this communication, signed August 22nd, 2022, of which was submitted to a supervisor in the FBI.

That person --

THE COURT:  So what purpose -- do you want to use it to impeach Ms. Davis?

MR. SKIPPER:  Absolutely.

THE COURT:  Let me defer ruling.

Do you have anything to add to that?  Is that how it happened?

MR. MACHICEK:  That's how it happened.  She wrote a draft transcript, dedicated it to a 302.  The videos were later submitted for official transcription.  We received official transcriptions by certified digitals.  Those are the transcriptions that were used during the course of the investigation for presentation in front of the Grand Jury and what we intend to use in front of the jury.

MR. SKIPPER:  And, Your Honor, I --

THE COURT:  Is there any other draft transcript?

MR. SKIPPER:  This is not a draft transcript.

THE COURT:  Is there any other potentially what Mr. Machicek could be referring to as draft transcripts?

MR. SKIPPER:  Not that I know of right now.

THE COURT:  Okay.  Let me defer on that one.

I have 17 next as McQueen is a whistleblower.

MR. MACHICEK:  Yes, Your Honor.  This isn't a whistleblower case.  There is not any information that Mr. McQueen has sought whistleblower protection at any time.  Mentioning him or labeling him by calling him a whistleblower would insinuate to the jury he may be biased in favor of the Government because of some supposed protections that he would

be offered by us.  That, as far as I am aware, is not the case.

He can be asked those questions on cross-examination if he has sought any of those protections, to establish that.  But to simply refer to him at any other stage of trial as a whistleblower is inappropriate.

MR. SKIPPER:  I appreciate Mr. Machicek telling me what I can ask on cross-examination, Your Honor.  He is not a qui tam relator in an FCA case.  Obviously, he is not going to have any financial incentive or motive for recovery, as far as I know, either.

The intent there would not be to say, Mr. Whistleblower.  If it comes up in trial.  He is the one who immediately called James Crowell within 24 hours of this incident occurring.  He is the one who blew the whistle.  I don't believe there is a legal definition in this context.  I can certainly say he is not going to get any money like you would in any other type of proceeding.  But he did, in fact, blow the whistle on what he thought occurred and why we are here.

THE COURT:  Okay.  I will grant the motion.  You know, obviously if evidence comes in that somebody else calls him a whistleblower, in that event then we can address it at that point.

MR. MACHICEK:  Next we have reference to a

recording device provided to John McQueen by case agents.

The device that was provided to Mr. McQueen was never used to make any recordings at all, much less anything relevant to these proceedings.  Mentioning a recording device, therefore, has no probative value.

MR. SKIPPER:  The probative value is that the Government is asking this Court to prevent me from asking a question about information they were obligated to provide.  They did not provide.  I find out through my own investigation.

And yet they want to preclude me from asking an agent the details of when you sat down with John McQueen on August the 12th, did not include any of this in the report which you chose to write, gave him instructions to record this man because he is dirty.

He listened to those instructions, kept that recording device until September the 26th of 2022.  They did not give me this information, which is Giglio.  And because, according to them, Your Honor, they are making these representations I find very disturbing.  There is nothing in this record.  There is no evidence.  What he has just told you he made himself a witness to this piece of evidence.

THE COURT:  Wait.  Let me back up.  So McQueen is a friend?  Who is McQueen?

MR. MACHICEK:  McQueen is the person who reported

the offense to Special Agent Crowell.

THE COURT:  Okay.  And who asked him to have a recording device?

MR. MACHICEK:  FBI agents provided him with a recording device.  John McQueen did not use the recording device and did not make any recordings.  There is not anything for us to disclose because he did not create any evidence with it.

THE COURT:  And then what is the basis to limine that out?

MR. MACHICEK:  That it is not relevant to any material fact that the jury is going to be asked to answer. There is -- it is the absence of evidence.

THE COURT:  Okay.  Mr. Skipper.

MR. SKIPPER:  It is completely relevant to the integrity of the investigation.

THE COURT:  How so?

MR. SKIPPER:  Well, Your Honor, Giglio, it is an impeachable document.  They had a meeting.  According to the Government, it was on Friday, August the 12th.  That is what I have been told.  Again, he is just telling you, Mr. Machicek, the same thing as Ms. Batson told me, they didn't do anything with it.

I have been provided no information from Agent Davis, from Agent Crowell.  There is no 302.  There is no

note, there is no memorandum whatsoever to concern or corroborate that information.

The mere fact they didn't even include it in a report, Your Honor, is a question that we would ask the witness under 611(b).  It goes to credibility.  On cross-examination, 611(b), the subject matter of the direct, credibility of the witness.

And the fact that an FBI agent, who has been around a time or two, she has worked in Newark, she has worked up in the WFO, would think -- it is not her first time to give somebody a handheld recording device.

She did that.  Didn't make a record of it.  Didn't disclose it at all.  And now they are just saying, without any evidence to support it, that I can't ask her or John McQueen why there is no recording.  The man made a 70-minute phone call to Kelly Smith.  It is on Kelly's phone records. 70 minutes.

Why?  Because when John McQueen first sat down with the FBI that Monday, August 1st, he said, you know, Kelly called me the next morning, and he said we all need to be on the same page about this.  He has a bad purpose.  He has an evil motive.

And so on August 12th they say, you know what you should do, is give him a handheld recorder and get him on the phone.  Well, phone records exist.  70 minutes.  And

according to the Government, with no document other than their statement to the Court, there is nothing to turn over because no recording exists, if, in fact, that is true.

I would ask those individuals that on cross-examination as to why you didn't include it in your report, why there are no recordings if you had ample opportunity to do this. You had it from August 12th through September 26th.

The FBI itself has now disclosed, despite the fact that they haven't reported one witness in this entire case, today we are going to get a recording of Jessica Mitchell. They thought it would be a good idea to start recording people. So we are going to have a recording of this witness today, despite not recording anybody else in this entire investigation.

And they want to preclude the Defense his Sixth Amendment right to confront and cross-examine his accusers to asking any witness about this incident.

THE COURT: Okay. Mr. Machicek?

MR. MACHICEK: Your Honor, we've made inquiries to the agents about the circumstances. There were no recordings made by Mr. McQueen, that we are aware of, to be turned over. If there were, we would have turned them over already.

THE COURT: And I will defer ruling on that one as well.

42

Takes to us 19, I believe.  Which I have as reference to Robert Evans' specific charges that are currently pending.

MS. BATSON:  Your Honor, may I have just a minute?

THE COURT:  You may.

(Pause in proceedings.)

MR. MACHICEK:  One last thing on the recording device, Your Honor.  It is my understanding from the agents that the recording device was not provided to Mr. McQueen in reference to this investigation but, rather, in relation to another investigation.

MR. SKIPPER:  And, Your Honor, she can say that under oath.  That is what we would ask.  That is what this process is for.

THE COURT:  Why don't y'all meet and confer on this recording-device issue and provide me with more specific information about what it is and whatever evidence there is.

MR. MACHICEK:  And, Your Honor, getting back to No. 19, specific instances of conduct that are prohibited under Federal Rule of Evidence 404(b), obviously, if a foundation can be laid for general reputation or character evidence of a victim in this case properly of a pertinent character trait under 404(a), that is admissible.  However, specific instances of conduct to show character -- are explicitly prohibited under the Rules of Evidence.

Specific offenses for which -- out of which the warrants arise are not relevant to this case. They are highly prejudicial, they are unadjudicated, they are contested, and would result in essentially a quasi mini trial as to the guilt or innocence of an unadjudicated person before the jury in an unrelated matter. That is highly confusing, highly prejudicial, and not even relevant.

THE COURT: Okay.

MR. SKIPPER: Your Honor, it is not confusing. If he has lied about something to the FBI, and she put him on the stand, despite him lying to them about these things --

THE COURT: Are you talking about the evidence?

MR. SKIPPER: Yes, sir. Then the Government is going to assert his Fifth Amendment rights for him. That is for an individual to assert on his own --

THE COURT: Okay. I will grant No. 19.

20, I think we have already covered.

MR. MACHICEK: Yes, sir.

THE COURT: 21.

MR. MACHICEK: Would be any testimony provided by Jessica Mitchell who was not a witness to the incident that gives rise to the charges in the Indictment.

Further, should she testify, the Government would be entitled to cross-examine her as to bias for the Defendant and more specifically the Defense attorney.

Throughout the course of our trial preparations, we have been made aware that Mr. Skipper intervened in a law enforcement incident on Ms. Mitchell's behalf.  Ms. Mitchell subsequently -- and during that intervention represented himself to be working in the capacity as her counselor in order to obtain information about a law enforcement incident.

Since that time Ms. Mitchell has denied any attorney-client relationship with Mr. Skipper and, therefore, that would create a circumstance under which Mr. Skipper would become a witness to the veracity of the claims that were made to law enforcement --

THE COURT:  You would like to eliminate her out completely?

MR. MACHICEK:  I think the circumstance that arises there in the cross-examination naturally leads to a conflict of interest.

THE COURT:  So, yes, you don't think she should be allowed to testify at all?

MR. MACHICEK:  That's correct, Your Honor.

THE COURT:  And what would you call her for, Mr. Skipper?

MR. SKIPPER:  I'd call her to get the video in.

May I respond in substance first --

THE COURT:  Okay.

MR. SKIPPER:  -- to what the Government is

requesting of this Court?

THE COURT:  She wasn't a witness, you agree, right?

MR. SKIPPER:  She was not a witness on July 25th, Your Honor, yes, that is true.  The Government has obtained information, which is fine, that I am doing on my own end through public information requests.

And so there is a little bit more background here that they have possession of because what James Crowell is doing is he is calling Ron Stutes, who is the attorney for the City of Hawkins, and obtaining my public information requests.

So all of the information that I am obtaining, then Ron Stutes is immediately sending over to James Crowell.  So how they have that information, good on them.  Probably should have done it a little bit earlier than that.  But that is how they are bringing this information to you.

There was a phone call that I received from Jessica Mitchell.  She is the mother of this young boy, the CE.  The phone call I received is on November 18th of 2022, and it was a Friday, discussing the fact that Guy McKee, the Chief of Police there in Hawkins, had left her a voice message issuing an arrest warrant for her for taking care of her son, for interference with child custody orders based on that.

Now, it is ironic that she now has full custody as of about two weeks ago of this little boy because Robert

didn't show up to his custody hearing.  But the fact is she called me concerned that Guy McKee is threatening to drive out to where she lives, which is nowhere near Hawkins, by the way, and arrest her for being a mother to this boy.

THE COURT:  What is it that you would call her for, to testify about that?

MR. SKIPPER:  It may become relevant.  I would --

THE COURT:  Let me do this:  I will defer ruling on it.  After the Government puts their case on, then we can revisit this issue.  I will have a better sense at that point what role she would play.

MR. SKIPPER:  May I just give the legal basis for it now?

THE COURT:  Okay.

MR. SKIPPER:  I will quote from Washington vs. Texas, 388 U.S. 14, quote, the right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the fact, as well as the prosecution's, to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process.

It is quoting from Chambers vs. Mississippi, 410 U.S. 284, quote, few rights are more fundamental than that of an accused to present witnesses in his own defense.

Those bedrock constitutional rights are going to be violated if Government is asking this Court to strike a witness based on their interpretation of what that witness might say.

That's all I have.

THE COURT:  Okay.  Anything else on your motion, Mr. Machicek?

MR. MACHICEK:  Just a simple clarification with regards to the case law that has been quoted.  Those bedrock rights are also subject to the rules that Congress has passed and that the Court is subject to.  I am simply bringing an issue where the rules may run into the presentation of witness testimony just like they would run into the testimony of any other witness.  That is what this is.  That is what the motion is for.

THE COURT:  Okay.  We will get an order out on that.  So if you didn't take good notes, we will help you out there.

Now, Mr. Skipper, do you want to address your motion, No. 58?

MR. SKIPPER:  Your Honor, I will go ahead, sure.

THE COURT:  Okay.

MR. SKIPPER:  I only have three points.  Subject to if something does change between now and then, we would seek permission from the Court to seek leave.

THE COURT:  Okay.

MR. SKIPPER:  The first is just the other alleged bad acts, Your Honor.  That is 404(b).  And, obviously, the Government is opposed to that based on 404(b) disclosure.

THE COURT:  Anything else on that, Ms. Batson, on 404(b)?

MS. BATSON:  No, Your Honor.

THE COURT:  Okay.

MR. SKIPPER:  And the second I believe the Government has agreed to is police policy violations do not equate to constitutional violations.

MR. MACHICEK:  That's correct, Your Honor, we don't have any opposition to the fact that police policy violations are not synonymous with constitutional violations.

THE COURT:  Okay.  So that one is granted.

MR. SKIPPER:  The last one is just speculation with regards to Defendant's state of mind.  I don't mean circumstantial evidence.  I mean just specifically saying he acted with willful conduct.

MR. MACHICEK:  I don't intend to offer any testimony of any witness, that I am aware of, that would -- the question would be propounded:  Did he act willfully in

your opinion or willful conduct?

We will be asking questions regarding circumstantial evidence in light of the jury's duty to infer from the totality of the circumstances what the Defendant's state of mind --

THE COURT:  Understood.  That one is granted.

I think that takes care of the motions in limine.

I have seen the jury instructions.  Do we have dueling versions.  Who has proposed jury instructions?

MR. SKIPPER:  We did them jointly, Your Honor.

THE COURT:  Okay.  Are they agreed?

MR. SKIPPER:  They are agreed except two portions, if I may just have one moment.

THE COURT:  Okay.

(Pause in proceedings.)

MR. SKIPPER:  Everything, Your Honor, except starting on Page 10.  And this is proposed additional language from Kelly Smith, the "Caution - Police Policy." The language that I used in the actual instruction was just taken from instructions from Judge Lynn in the healthcare fraud trial, as well as Judge Starr last May.

A little bit different in terms of the allegations, but it is with regard to internal regulations and policy violations not equating to or being synonymous with an actual crime.

So the language is just what I proposed.  And then I have submitted there in a footnote just the supporting case law.

THE COURT:  Okay.

MR. SKIPPER:  And those are civil cases, Your Honor.  But for clarification, the standard for civil 1983 is the same as far as the reasonableness language.  That is why I included those.

THE COURT:  Ms. Batson?

MS. BATSON:  Your Honor --

THE COURT:  And I'm not going to decide this today, but if you would like to give me a preview, that would be helpful.

MS. BATSON:  Your Honor, I would ask the Court to let us look at these policies -- or these instructions and speak with Mr. Skipper.  I believe there is another one that has been used before.  But since it is outside the Fifth Circuit pattern instruction, I need to make sure that this is the one that has been used across the country.

THE COURT:  Okay.

And then you said there was a second issue, Mr. Skipper?

MR. SKIPPER:  Yes, Your Honor.  May I just have...

The second issue is found on Page 13, Your Honor. It is just in the second element for the 242 elements, the

violation.  And the 2012 and 2015 pattern carry both a bad purpose and an evil motive.

The 19, as you can see, only carries with it a bad purpose.  I bring that up to the Court because the analysis within the Fifth Circuit is not clear, never has been clear, and the case law I have cited there in support is based on U.S. vs. Screws.  It clearly says it has been -- if I can just find one cite here, Your Honor.

I am going to cite Bryan vs. United States, 524 U.S. 184.  It is a pinpoint of 192 -- 191 to 192.  It is in 1998.  The instructions language requiring, quote, bad purpose or, quote, evil motive suggests knowledge of unlawfulness.

And then they say:  As a general matter, when used in a criminal context, a willful act is one undertaken with a bad purpose.  In other words, in order to establish a willful violation of statute, the Government must prove that the Defendant acted with knowledge that his conduct was unlawful.

With respect to the conduct, that is only criminal when done willfully.  The jury must find that the Defendant acted with an evil-meaning mind, an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful.

And I cite there in the footnote, Your Honor, just from another case, United States vs. Warren.  That is 2013

U.S. District Lexis 174067, pinpoint 1 through 2.

Quote:  Case law demonstrates that within the Fifth Circuit, there is no single magic formula for determining willfully in the context of Section 242.  Rather, the Fifth Circuit has repeatedly affirmed instructions found to be consistent with the teachings of Screws that the term "willfully" in 18 USC, Section 242, implies conscious purpose to do wrong and intent to deprive another of a right guaranteed by the Constitution, federal statutes, or decisional law.

And then there is a case cite there, United States vs. Kerley, K-e-r-l-e-y, 643 F.2d 299, pinpoint 303, year 1981.  It is reversing a conviction where the district court failed to charge the jury that "willfully," as used in Section 242, quote, means acting with bad purpose or evil motive.

And if I may give another cite, United States vs. Sipe, S-i-p-e, stating that:  The district court properly instructed the jury that willful conduct was conduct engaged in, quote, with a bad purpose or evil motive to disregard the law.

And, finally, United States vs. Ruiz, affirming the trial court's refusal to give pattern Section 242 instruction in favor of instruction that defined "willfully" as quote:  A bad purpose or evil motive either to disobey or disregard the

law.

That's all I have.

THE COURT:  Okay.  Ms. Batson.

MS. BATSON:  Your Honor, all of those cases were before the 2019 instruction that was issued, and we would just urge the Court to go along with the Fifth Circuit pattern instruction.

THE COURT:  We will take a look at it, and we will talk about this issue again.

Anything else on jury instructions?

MR. SKIPPER:  No, Your Honor.

MS. BATSON:  No, Your Honor.

THE COURT:  Now, on the 404(b) evidence, Ms. Batson or Mr. Machicek, just I know you said it is to prove intent. Do you want to -- but it looks awfully close to bad character evidence.

MS. BATSON:  Your Honor, it is offered for absence of mistake and for intent.  And that is the purpose, Your Honor.

There is two witnesses and one video.  It is not going to be a mini trial.  It is clearly offered for intent -- willfulness and intent are the issue here.  The prior bad acts that Mr. Smith was involved in, that he absolutely knows about, this is not a surprise to him, Your Honor, is analogous to what he is charged with here.

THE COURT:  Okay.  Thank you.

Now, anything else to talk about regarding the trial?

MS. BATSON:  The continuance, Your Honor.

THE COURT:  Well, I will issue an order on the continuance in the next day or two.

MS. BATSON:  Okay.  Your Honor, can I just address that?  Because I don't think I was able to address the continuance.

THE COURT:  Okay.

MS. BATSON:  As the Court has noted, the trial is still one month away.  All of our witnesses, including myself and the case agents, we all arranged our schedules in order to have this trial go on the 26th.

Again, in December of 2022, that is when this was set, we received May 29th, I think it is, about a 120-page expert opinion report.  We are not complaining.

The fact that Mr. Skipper is just now getting this expert witness opinion or having to interview other witnesses should not be held against the Government and the other people involved in this case when this case was set.

This case has been on the Court's calendar, on Defense counsel's calendar, on everybody's calendar since last year, Your Honor.  And we would just ask the Court not to continue this case.

THE COURT:  Okay.  Do you want to say anything more?

MR. SKIPPER:  I would like to just respond to that.

THE COURT:  Okay.

MR. SKIPPER:  The expert report was filed May 29th when I received it from Mike Kmiecik on May 29th.  When it was in March when they had theirs and turned theirs over in May -- I don't want to get into this, but so the Court knows, I am not stalling.  I am getting this case ready for trial.  I am getting ready with what is in front of me --

THE COURT:  I understand.

MR. SKIPPER:  I am sorry about the scheduling.

THE COURT:  How much time do we think -- at one point you said a week.  Is it going to take a week?  Is that realistic, five days?

MS. BATSON:  Yes, Your Honor.

THE COURT:  Do you agree, Mr. Skipper?

MR. SKIPPER:  Sure, in that time frame, yes, Your Honor.

THE COURT:  Okay.

Okay.  Well, then if there is nothing further, I will get an order out on the continuance motion as soon as possible so that you all can plan accordingly, and we will memorialize my rulings today on the motions in limine.

56

Otherwise, anything further?

MR. SKIPPER:  No, Your Honor.  Thank you.

MS. BATSON:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  We are adjourned.

(Hearing adjourned.)


CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                          June 2, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter